[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Memorandum of decision on petitions filed by the Commissioner of the Department of Children and Families to terminate the parental rights of (1) the respondent mother, Patricia D[1], and the putative father, Pete C[2], with respect to the minor child, Destiny, and (2) the respondent mother, Patricia D and the respondent father, Shawn S, with respect to the minor, children Jamella and Shawn.
The terminations of parental rights are Granted.
On June 13, 1999, the Department of Children and Families (D.C.F.) invoked a ninety-six (96) hour hold upon Destiny D, whose date of birth is June 1990, Jamella S whose date of birth is August 1991, and Jamella's twin brother, Shawn S, whose date of birth is also August 1991. On June 15, 1999, an Order of Temporary Custody (O.T.C.) was applied for and granted by the court (Cohn, J.). The allegation was that all three (3) children were in immediate physical danger from their surroundings. A concomitant neglect petition was filed alleging that Destiny was neglected in that she was: (1) being denied proper care and attention physically, educationally, emotionally, or morally, (2) being permitted to live under conditions, circumstances, or associations injurious to her well-being, and (3) abused in that she had (a) physical injury or injuries inflicted by other than accidental means, and (b) a condition which was the result of maltreatment such as, but not limited to malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment. Concomitant neglect petitions were also filed alleging that Jamella and Shawn were neglected in that they were: (1) being denied proper care and attention physically, educationally, emotionally, or morally, and (2) being permitted to live under conditions, circumstances, or associations injurious to their well-being. The first hearing on the O.T.C.s was held on June 25, 1999. At that hearing service was confirmed for Patricia D and Shawn S, they were advised of their rights and counsel was appointed for them (Cohn, J.). The father of Destiny was listed as Maurice D. Mr. D was listed as deceased. On July 2, 1999, the O.T.C. was confirmed as to CT Page 15328-b Destiny only and preliminary specific steps for Ms. D and Mr. S were entered by the court (Cohn, J.) The O.T.C.s as to Jamella and Shawn were continued without prejudice. The hearing on their O.T.C.s and the hearing on the neglect petitions for all the children were consolidated and set down for September 8, 1999. On September 8, 1999, Ms D entered pleas ofnolo contendere on the neglect allegations for all three (3) children. The pleas were canvassed and accepted by the court (Dewey, J.). Mr. S did not enter a plea and remained silent. The disposition was commitment of all three (3) children to D.C.F. from September 8, 1999, to September 8, 2000. Also on this date final specific steps were signed by Ms. D and Mr. S and approved by the court. On July 25, 2000, the commitment was extended from September 8, 2000, to September 8, 2001 (Gallagher, J.). On March 8, 2001, a permanency plan of Termination of Parent Rights (T.P.R.) was approved and a finding was made that reasonable efforts to reunify Destiny, Jamella, and Shawn with Ms. D and Jamella and Shawn with Mr. S were no longer appropriate (Conway, J.)
Destiny has been placed continuously with Bernice Brown since coming into D.C.F. care in June 1999. Jamella and Shawn were initially placed with their aunt Jacqueline S. In late March 2000, the twins were removed from their paternal aunt. Jamella was then placed with Ms. Gussie Steele, where she currently resides. Shawn was placed with a temporary foster family for about a month. In April 2000, he was placed with Elizabeth and Harry Harris, where he currently resides.
On April 4, 2001, D.C.F. filed a petition seeking to terminate the parental rights of Ms. D for all three (3) children. In-hand service was effectuated on Ms. D on April 17, 2001. For all three (3) children D.C.F. has alleged two (2) grounds concerning Ms. D (1) that all three (3) children have been found in a prior proceeding to have been neglected or uncared for and have been in the custody of the Commissioner of D.C.F for at least fifteen (15) months and that Ms. D has been provided specific steps to take to facilitate the return of these children to her and Ms. D had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of all three (3) children, she could assume a responsible position in their respective lives, and (2) that there is no ongoing parent-child relationship between each child and Ms. D.
A T.P.R. petition was also filed on April 4, 2001, seeking to terminate the parental rights of Pete C, the putative father of Destiny. Notice to Pete C was effectuated by publication of notice on April 13, 2001, in theNew Haven Register, a newspaper of general circulation in the New Haven area and publication of notice on April 15, 2001, in the Raleigh News andObserver, a newspaper of general circulation in the Raleigh, North CT Page 15328-c Carolina area. The T.P.R. petition alleged three (3) grounds: (1) that Destiny was abandoned by Mr. C in that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Destiny, (2) that Destiny had been found in a prior proceeding to have been neglected or uncared for and had been in the custody of the Commissioner of D.C.F for at least fifteen (15) months and that Mr. C had been provided specific steps to take to facilitate the return of Destiny to him and Mr. C had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Destiny he could assume a responsible position in her life, and (3) that there is no ongoing parent-child relationship between Destiny and Mr. C.
A T.P.R. petition was also filed on April 4, 2001, seeking to terminate the parental rights of Shawn S the father of Jamella and Shawn. Notice to Shawn S was effectuated by publication of notice on June 21, 2001, in theNew Haven Register, a newspaper of general circulation in the New Haven area. Also, in-hand service was effectuated on Mr. S on July 24, 2001. D.C.F. has alleged for both children three (3) grounds concerning Mr. S: (1) that Jamella and Shawn were abandoned by Mr. S in that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Jamella and Shawn, (2) that Jamella and Shawn had been found in a prior proceeding to have been neglected or uncared for and have been in the custody of the Commissioner of D.C.F for at least fifteen (15) months and that Mr. S had been provided specific steps to take to facilitate the return of these children to him and Mr. S had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Jamella and Shawn he could assume a responsible position in their respective lives, and (3) that there is no ongoing parent-child relationship between Jamella and Mr. S and between Shawn and Mr. S.
On May 4, 2001, service was confirmed for Ms. D, and she was advised of her rights. (Conway, J.) Also on May 4, 2001, notice was confirmed for Mr. C and a default was entered against him. On July 31, 2001, service was confirmed for Mr. S and he was advised of his rights. (Brenneman, J.).
D.C.F. filed motions to amend the T.P.R. petitions on October 19, 2001, and on January 9, 2002. Both those motions were granted by the Court on January 17, 2002 (Conway, J.).
The Respondent mother Patricia D is opposing the termination of her parental rights and has been represented throughout this entire proceeding by counsel. The Respondent father, Shawn S is opposing the termination of CT Page 15328-d his parental rights and has been represented throughout this entire proceeding by counsel. Each child has been represented throughout this entire proceeding by separate counsel.
The termination of parental rights hearing commenced on February 26, 2002, resumed on March 11, 2002, March 25, 2002, April 8, 2002, April 9, 2002, April 24, 2002, April 29, 2002, May 3, 2002, May 6, 2002, May 7, 2002, May 9, 2002, May 13, 2002, May 14, 2002, and May 16, 2002, Evidence concluded on May 28, 2002. Closing arguments were made, on May 31, 2002.
Briefs were filed on the following dates: Respondent mother, July 3, 2002; Jamella, July 16, 2002; Respondent mother's brief, August 1, 2002; Shawn, August 2, 2002; Petitioner's reply brief to Destiny, August 7, 2002; Petitioner's reply brief to Destiny's brief, August 12, 2002. On August 12, 2002, D.C.F. filed a motion to expunge the dispositional portion of Destiny's trial brief. A hearing on that motion was held before this court on September 17, 2002. The motion was denied.
 ADJUDICATORY FINDINGS
The hearing on a petition to terminate parental rights comprises two phases.
In the adjudicatory phase the trial court must determine whether any of the statutory grounds alleged by D.C.F. exist by clear and convincing evidence. In the adjudicatory phase the court is limited to considering events preceding the filing of the termination petition or the latest amendment. If a determination is made that one or more of the statutory grounds exist, the court then proceeds to the dispositional phase. In this phase the court determines whether the termination of parental rights is in the best interest of the child. In making this determination the trial court can consider all events occurring prior to the date(s) of the dispositional hearing including those occurring after the filing of the petition.
In order to terminate the parental rights of Ms. D, Mr. S and Mr. C, D.C.F. must initially show by clear and convincing evidence that it has made "reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts" Conn. Gen. Statute Section 17a-112 (j)(1). The court need not make such a finding, however, "if the court has determined at a hearing pursuant to subsection (b) of Section 17a-110 or Section 17a-111b that such efforts are not appropriate" Conn. General Statute. Section 17a-112 (j)(1); In reKachainy C., 67 Conn. App. 401, 409 (2001). CT Page 15328-e
In this case a finding was made on March 8, 2001, that reunification efforts were not appropriate for Ms. D and Mr. S (Conway, J.). However, a review of the transcript for that date reveals, contrary to the claim of the Petitioner in her brief, that this finding was not made by clear and convincing evidence, as required by both Section 17a-110 and In reKachainy C. In addition, again contrary to the claim of the Petitioner in her brief, no finding on reunification efforts was made concerning Mr. C on March 8, 2001. Prior to the filing of the T.P.R. petition on April 4, 2001, D.C.F. named Maurice D as Destiny's father. In fact, Mr. C was not named as Destiny's father prior to the filing of the T.P.R. A finding that reunification efforts were not appropriate has never been made concerning Mr. C.
The record, by clear and convincing evidence, establishes the following:
The location of Ms. D has never been an issue and her whereabouts have always been known.
All three children were committed to D.C.F. on September 8, 1999. D.C.F. provided the following services to reunify Ms. D and her children. Ms. D was provided with casework services. D.C.F. also arranged for visits between Ms. D and the children and provided bus passes for Ms. D. D.C.F. also referred Ms. D for substance abuse treatment to Central Treatment Unit and the APT Foundation. Ms. D was incarcerated from May 12, 2000, to May 8, 2001. As such, it would have been nearly impossible for D.C.F. to provide any type of counseling to Ms. D during this time. In addition D.C.F provided counseling and therapy: Destiny — Children Guidance Center of Greater Bridgeport; Shawn and Jamella — the Yale Child Study Center (Y.C.S.C.); Shawn — Boys' Village Extended Day Services; Jamella — Hill Health Center and Family Guidance Center (H.H.C).
Therefore, the court finds that D.C. F. has proven by clear and convincing evidence that it has made reasonable efforts to locate Ms. D and it has made reasonable efforts to reunify all three children with Ms. D.
The location of Mr. S is an issue and at times his whereabouts have not been known to D.C.F. Mr. S testified that he presently lives in a one family house at Howard Avenue in Ansonia. Mr. S's testimony about where he lived during the pendency of this case was confusing, and at times, contradictory. Mr. S testified that he went to a government agency to seek housing in June or July of 1999, or June or July of 2000. (testimony of Shawn S at page 110-111). According to Mr. S, he (1) lived on Howard CT Page 15328-f Avenue when the twins were placed with his sister in June of 1999, (testimony of Shawn S at page 112); (2) moved to Howard Avenue in January or February 2000 (testimony of Shawn S at page 141); and (3) moved into the Howard Avenue home in the middle of 2000 (testimony of Shawn S at page 134). In addition, Mr. S was: (1) a resident of Lebanon Pines, an impatient substance abuse facility for nine (9) days in February 2001; (2) a resident of Northside, an impatient substance abuse facility during May 2001; and (3) a resident of Gibbs House, a sober house, in May and June of 2001. Michael Milano testified that during the time he was the D.C.F. social worker assigned to the children (June 1999 to August 2000), Mr. S's whereabouts were known most of the time but at times his whereabouts were unknown. Valecia Williams, the D.C.F. worker assigned to the children from August 2000, to the present, testified that Mr. S had no contact with D.C.F. from the time the twins were removed from their aunt's house in late March 2000, until he contacted D.C.F. in September 2000. She then did not hear from Mr. S again until she got a telephone call from him in August 2001. She also testified that Mr. S informed her of his address in Ansonia in August 2001. Valecia Williams, further testified that she sent various correspondence to Mr. S at the address that D.C.F. had for Mr. S and that the correspondence came back unclaimed. Mr. S's sister did not know his address in Ansonia. Mr. S himself moved several times during the pendency of this case and his own testimony is contradictory as to where he was living at various times. In addition, Mr. S's credibility is suspect because he testified that he was not truthful on applications he submitted to various substance abuse facilities. D.C.F. could have been more thorough in their efforts to locate Mr. S. However, they have fulfilled the statutory requirement in that they made reasonable efforts to locate Mr. S.
In order for D.C.F. to provide services to Mr. S, he would have had to make himself known to D.C.F. Mr. S's whereabouts being unknown for long periods of time are because of the actions and inactions of Mr. S. In addition, Mr. S did not contact D.C.F. for long periods of time. This sporadic contact is addressed below in greater detail in the discussion on abandonment. D.C.F cannot be expected to provide services to an individual who chooses not to make himself available for services.
Mr. S never asked that the twins be placed with him when they were removed from Ms. D. Mr. S's main problem when the twins were taken by D.C.F. was the lack of adequate and appropriate housing. This seems to have been a long-standing problem for Mr. S. According to Mr. S it was the only thing that he needed in order for his children to be returned to him. D.C.F. does not provide housing services except in certain limited circumstances. Mr. S did not fall into any of these limited circumstances. However, Michael Milano did refer Mr. S to the Department CT Page 15328-g of Social Services (D.S.S.) so that they could assist Mr. S. Mr. S acknowledged this referral and indeed testified that he went to a housing agency and completed an application. Mr. S testified that the residence he is living in now is appropriate for the twins. Mr. S testified that he tried to contact D.C.F. to inform them that he when the children were removed from their aunt's home that he had appropriate housing for the twins, but according to Mr. S D.C.F. never contacted him back. However, Mr. S also testified that he never requested the court to order D.C.F. to consider him as a resource for the children.
Mr. S also had a substance abuse problems. However, Mr. Milano testified that Mr. S never submitted to him verification of substance abuse treatment (Respondent father's Exhibit 1 and Exhibit 3) and so Mr. Milano felt that no other treatment was necessary.
Therefore, the court finds that D.C. F. has proven by clear and convincing evidence that it has made reasonable efforts to locate Mr. S and it has made reasonable efforts to reunify all three children with Mr. S.
D.C.F made reasonable efforts to locate Pete C. Given the fact that he has not been part of Destiny's life it comes as no surprise that they were unable to find him. Because D.C.F., despite reasonable efforts, could not locate Mr. C. they could not provide services to him to reunify him to Destiny.
 NO ONGOING PARENT-CHILD RELATIONSHIP
D.C.F. has alleged that there is no ongoing parent-child relationship between each parent and their respective child(ren). Conn. General Statute Section 17a-112 (j)(3)(D) provides for the termination of parental rights if, upon clear and convincing evidence, it is proven that no ongoing parent-child relationship existed in excess of one year, "the statute requires the court to take a two-pronged analysis. First, there must be determined that no parent child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop . . . It is reasonable to read the language of "no ongoing parent-child relationship' to contemplate a situation in which regardless of fault a child . . . has definitely lost that relationship so that despite its former existence it has now been completely displaced . . . In considering whether a parent-child relationship exists, the feelings of the child are paramount importance . . . The ultimate question is whether the child has no present memories or feelings for the natural parent . . . Feelings for the natural parent CT Page 15328-h consist of a positive feeling only." In re Kezia, 33 Conn. App. 12, 20-21
(1993) (internal citations omitted)
PATRICIA D — DESTINY
Karen Meeks, Destiny's therapist, was called as a witness by the Petitioner and testified extensively. She was qualified as an expert clinical social worker in the treatment of children. Destiny came to her as a deeply troubled child. Ms. Meeks diagnosed Destiny as having an adjustment disorder with anxiety and depressive symptoms. Destiny had trouble forming a relationship with Ms. Meeks because the trust relationship between Destiny and Ms. D was broken by Ms. D. For a significant period of time Destiny, contrary to most children, would not even speak of her mother. Destiny never spoke spontaneously about her mother to Ms. Meeks. Over her two (2) year period of working with Destiny, Ms. Meeks testified that Destiny had nothing positive to say about her mother. Ms. Meeks concluded that there is a relationship between Destiny and her mother, but that relationship is not a positive one "[c]ourts are entitled to give great weight to professionals in parental termination cases." In re Christina V., 38 Conn. App. 214, at 221
(1995). Dr. Nancy Randall was called as a witness by the Petitioner to testify and was qualified as an expert in clinical psychology. Dr. Randall performed court ordered psychological evaluations of Ms. D, Destiny, Jamella, and Shawn and a parent/child interactional evaluation of Ms. D and her children. She testified that Destiny has positive memories of her mother but agreed with Ms. Meeks that the relationship between Ms. D and Destiny was not a positive one. In fact, Dr. Randall described the relationship between Destiny and her mother as a "somewhat distant relationship (and) . . . that Destiny appeared reluctant to interact much with her mother . . . Destiny appears to feel conflicted about her mother. She still has a relationship with her, but withdraws in an attempt at a self-protection." (Petitioner's Exhibit K at page 13). Valecia Williams described the relationship between Destiny and Ms. D not as a mother-child relationship but as a big sister-little sister relationship. According to Dr. Randall, Destiny turns to her foster mother to fill the role of psychological parent. Destiny does not view Ms. D as her psychological parent. A psychological parent is the person(s) to whom Destiny, or any child, would look to for love, security, stability, and nurturing — the person a child can count on when something goes wrong. In addition, any positive memories pale in comparison to the lack of positive feelings displayed by Destiny toward her mother and the lack of trust Destiny has in her mother as testified to by Karen Meeks. The fact that Destiny may enjoy visiting with her mother (and the twins) does not equate to an ongoing parent child relationship. Therefore, it has been established by clear and convincing CT Page 15328-i evidence that presently there is no ongoing parent-child relationship between Destiny and Ms. D. The second-prong of the analysis requires the court to determine if it is in Destiny's best interest to allow additional time for this relationship to develop. As of the close of evidence Destiny has been with her present foster mother for almost three (3) years. Both Dr. Randall and Karen Meeks described the relationship between Destiny and her foster mother as a close, comfortable, and trusting one. Ms. Meeks does not know if the parent-child relationship can be reestablished between Ms. D and Destiny. Dr. Randall testified that their relationship would take a substantial length of time to develop. However, given the fact that the trust relationship between the two of them has been broken this is unlikely. Therefore, D.C.F. has proven by clear and convincing evidence that there is no ongoing parent-child relationship between Destiny and Ms. D
PATRICIA D — JAMELLA
Jamella, is in a different situation than Destiny. Mary Diamond, Jamella's clinician at the Hill Health Child Center and Family Guidance, was called as a witness by the Petitioner. The court denied the Petitioner's request to qualify Ms. Diamond as an expert in family and child therapy. Jamella has expressed to Mary Diamond that she does not like her mother and is angry with her, but still loves her mother (although Jamella told Ms. Diamond that she wants to live with her foster mother, Ms. Steele). Dr. Randall concluded that although there was some ambivalence in the relationship between Jamella and Ms. D that to an extent Jamella viewed her mother as a psychological parent and that the role of psychological parent for Jamella is shared between Ms. D and Jamella's foster mother.
Therefore, D.C.F. has failed to prove by clear and convincing evidence that there is no ongoing parent-child relationship between Jamella and Ms. D.
PATRICIA D — SHAWN
Kristen Holdt, was called as a witness by the Petitioner and was declared an expert in clinical social work. She treated both Shawn and Jamella in her capacity as a clinician at the Yale Child Study Center. In addition, she provided individual therapy for Shawn. Ms. Holdt testified that Shawn had positive feelings about his mother and had positive experiences when he visited with his mother in jail, although he refused to talk about his mother after she was released from jail. Ms. Holdt concluded from this that Shawn has extremely conflicted feelings about his mother. However, Ms. Holdt did not have an opinion as to the CT Page 15328-j relationship between Shawn and Ms. D. As with Jamella, Dr. Randall concluded that the relationship between Shawn and Ms. D was important to him on some level and, although not as close a relationship as one would expect, Shawn nevertheless, to some extent, has a parent — child relationship with his mother. As with Jamella, the role of psychological parent for Shawn is shared between Ms. D and Shawn's foster mother/father.
Therefore, D.C.F. has failed to prove by clear and convincing evidence that there is no ongoing parent-child relationship between Shawn and Ms. D.
SHAWN S
The determination of if there is an ongoing parent-child relationship between Mr. S and each of his children, if Mr. S has rehabilitated, and if Mr. S has abandoned his children cannot be examined in a vacuum. This determination, as well as Mr. S's credibility, is aided by an analysis of Mr. S's involvement with his children both before and after the June 14, 1999, O.T.C.
Mr. S was living with Ms. D when the twins were born on August 1991. He continued to live with and Ms. D and the twins until approximately August 1994. The twins were removed from Ms. D on December 9, 1994, were committed to D.C.F. in March of 1995, and were returned to Ms. D on November 19, 1997. Mr. S testified that he had no contact with the children during this almost three (3) year period of time. Mr. S testified that he visited with the children regularly from 1997 to 1999. Dr. Bruce Freedman was called as a witness by the Respondent father. No party sought to qualify Dr. Freedman as an expert in clinical psychology. However, given Dr. Freedman's experience, qualifications and the fact that he performs court ordered evaluations and interactionals, this court will treat Dr. Freedman as an expert. In July 1999, Dr. Freedman performed court ordered psychological evaluations of Ms. D, Mr. S, Destiny, Jamella, and Shawn and a parent/child interactional evaluation of Ms. D and her children and Mr. S and his children. Dr. Freedman testified that Mr. S told him that he had not seen the twins for a year before the evaluation, contradicting parts of his testimony. Mr. S related to Dr. Freedman that he tried to visit the children but Ms. D would not allow him, and that after a while he stopped trying. Mr. S also told Dr. Freedman that he had not paid any child support for the twins.
Mr. in testified that he took his children from his sister's on weekends to visit with him at his house"every week, just about" and "quite a few times" (testimony of Mr. S at page 127). He later changed CT Page 15328-k his testimony to say that he took the children for visits starting in January or February 2000, but that he visited with the children at his sister's, Jacqueline S, before this time. Mr. S testified that during these visits he would take the children places and have fun with them, enjoying his children. The twins told their respective therapists of a maximum of three (3) visits. On one of these visits Mr. S left the twins alone with a twelve (12) year-old boy while he was out of the home and all three children wrestled and rolled around on the floor. Michael Milano testified that another problem with the visits were claims made by the twins that they were not getting enough to eat when they were at their father's home. In response to this, D.C.F. recommended to Ms. S in late 1999, that Mr. S not take the children out of her home and that she supervise the visits. To the best of Mr. Milano's knowledge, Ms. S followed this recommendation, contradicting Mr. S's testimony that he took the children to his home for visits in early 2000.
SHAWN S — JAMELLA
Witnesses testified that a parent-child relationship between Mr. S and Jamella does not exist. Jamella spoke very little of her father with Kristen Holdt. Jamella did speak about the few visits she had with her father while she has at her aunt's home. She told Ms. Holdt that she felt that she had been let down by Mr. S because he had gone and not come back to visit. Mary Diamond testified that Jamella refused to talk about her father with her and on those occasions when she did speak of him Jamella said only negative things — that she hated her father because he was bad.
To have a parent-child relationship with a child the parent must interact with the child. To interact with a child the parent must recognize an individual as his child. Both Valecia Williams and Mary Diamond testified of an incident that shows the lack of a parent-child relationship. Jamella related to both of them an incident in late 2000 or early 2001, when she was at a church with other individuals and they ran into Mr. S. Jamella related that she told Mr. S who she was. He did not recognize her and said it could not be her. Mr. S testified that this incident did not occur. Given, Mr. S's questionable credibly and the fact that Jamella related basically the same version of this incident to two different people the court finds that this incident did occur.
Mr. S was basically absent from Jamella's life for approximately four (4) years from August 1994, to July 1998. From March 2000, to the end of trial Mr. S did not visit her often and on one occasion when he did, he left her with someone else. For a child to have a parent-child relationship there must be involvement with a parent from whom positive CT Page 15328-l feelings toward that parent can arise. That is absent in Jamella's case and it lends credibility to her negative feelings toward her father and lends credibility to all the witnesses who testified that there is no ongoing parent-child relationship between Jamella and Mr. S
Therefore, D.C.F. has proven by clear and convincing evidence that there is no ongoing parent-child relationship between Jamella and Mr.S.
SHAWN S — SHAWN
Just as in Jamella's case, witnesses testified a parent-child relationship between Mr. S and Shawn does not exist. Michael Milano and Valencia Williams both testified that Shawn did not speak about his father. During their entire involvement with Shawn he never talked about his father. Kristen Holdt echoed this when she testified that during the entire course of her treatment of Shawn, he did not express his feelings about his father. Other than speaking of the same visits that Jamella did, Shawn never mentioned Mr. in to Kristen Holdt. According to Ms. Holdt, Shawn does not talk about his father at all and has "just basically accepted his father's role (as being) absent . . . He does not seem to have any significant anxiety or anger about not seeing him" (Testimony of Kristen Holdt of May 3, 2002, at page 45). Mr. S testified that during the summer of 2001, he ran into Shawn and Shawn's foster parents at Lowe's in West Haven. According to Mr. S, Shawn said "There's my daddy," ran to Mr. S and hugged and kissed him. The court finds that Mr. S did run into Shawn. However, given the testimony of the other witnesses in this case and the questionable credibility of Mr. S the court does not find credible the testimony of Mr. S concerning the happiness and affection shown by Shawn.
Just as with Jamella, Mr. S was basically absent from Shawn's life for approximately four (4) years from August 1994 to July 1998. From March 2000, to the end of trial Mr. S did not visit him often and on one occasion when he did he left him with someone else. For a child to have a parent-child relationship there must be involvement with a parent from whom positive feelings toward that parent can arise. Just as with Jamella, this involvement is missing and it lends credibility to Shawn's negative feelings toward his father and lends credibility to all the witnesses who testified that there is no ongoing parent-child relationship between Shawn and Mr. S.
Therefore, D.C.F. has proven by clear and convincing evidence that there is no ongoing parent-child relationship between Shawn and Mr. S.
PETE C — DESTINY CT Page 15328-m
D.C.F. has alleged that there no ongoing parent-child relationship between Destiny and Mr. C. None of the witnesses testified as to any type of contact between Destiny and Mr. C that any relationship existed, or exists today, between the two of them or that Destiny has any positive feelings toward him. This is because he has never been part of Destiny's life.
Therefore, D.C.F. has proven by clear and convincing evidence that no ongoing parent-child relationship exists between Pete C and Destiny.
 FAILURE TO REHABILITATE
D.C.F. has alleged that Ms. D, Mr. S, and Mr. C is the parent of a child, or children, who is or are neglected or uncared for and have been in the custody of the Commissioner (of D.C.F.) for at least 15 months and that each of them has been provided with specific steps to facilitate the return of their child(ren) to each of them and that each of them has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child(ren), each of them could assume a responsible position in the lives of their respective child(ren). This ground tracks the language contained in Conn. General Statue Section 17a-112
(j)(3)(B) (ii).
PATRICIA D
Ms. D has a long-standing and substantial substance abuse problem. Ms. D has recently turned forty-five (45). Dr. Bruce Rounsaville was called as a witness by the Respondent mother. No party sought to qualify Dr. Rounsaville as an expert in psychiatry and neurology with a sub specialty in substance abuse diagnosis and treatment. However, given Dr. Rounsaville's experience and qualifications the court will treat Dr. Rounsaville as an expert. Dr. Rounsaville performed a psychiatric evaluation of Ms. D. at the her counsel's request. According to, Dr. Rounsaville, Ms. D's substance abuse problems go back to her teens. Dr. Leslie Kurt was called as a witness by the Petitioner. Dr. Kurt was qualified as an expert in addictive psychology. She is an attending psychiatrist at the Yale Psychiatric Institute Dual Diagnosis Partial Hospital Program (Y.P.I./D.D.P.H.P.). Dr. Kurt diagnosed Ms. D as having various substance abuse problems. — alcohol dependence, cocaine dependence, and marijuana dependence. Dr. Rounsaville, agreed with these diagnoses In fact it was this substance abuse that led to Ms. D hitting Destiny, which in turn led to the O.T.C. of June 15, 1999. Ms. D testified that when she hit Destiny "I was intoxicated. I was drunk and CT Page 15328-n high on crack cocaine (testimony of Ms. D of May 7, 2002, at page 27).
After the O.T.C. was granted, Ms. D entered the APT foundation substance abuse program on October 19, 1999. She was discharged from that program on December 6, 1999, for noncompliance due to missing six (6) of twelve (12) appointments, minimal participation and for testing positive for cocaine and/or marijuana seven (7) times. Upon discharge Ms. D was referred to the Hospital of St. Raphael (H.S.R.) for intensive outpatient treatment. She failed to complete this program. On March 14, 2000, Ms. D entered Y.P.I./D.D.P.H.P. She was discharged from this program on May 11, 2000, for noncompliance. Ms. D was incarcerated from May 12, 2000, to May 8, 2001, at Niantic. While there, she successfully completed the Marilyn Baker substance abuse program. Upon her release D.C.F. offered to refer Ms. D to supportive housing. She refused this offer and went back to live on Truman St., where she had lived prior to being incarcerated. After her release Ms. D was admitted for a second time to Y.P.I./D.D.P.H.P. She was admitted on May 18, 2001, and discharged for noncompliance on July 18, 2001. Ms. D was admitted for a third time to Y.P.I./D.D.P.H.P. on August 23, 2001, and discharged for noncompliance on September 25, 2001. Ms. D was admitted into the Crossroads-Amethyst Program (C/A), an impatient substance abuse program on October 21, 2001, successfully completed this program, and was discharged on March 14, 2002.
Ms. D has had a problem with addiction to substances, off and on, for approximately twenty-five (25) years. As of the adjudicatory date of January 17, 2002, Ms. D had been substance free for approximately four (4) months (her last positive urine was on September 10, 2001, for cocaine). Also, as of the adjudicatory date she was on her way to successfully completing the C/A program. However, as of the adjudicatory date the court finds by clear and convincing evidence that Ms. D had failed to rehabilitate concerning her substance abuse problem.
The court's inquiry must not stop here because the "failure to rehabilitate" ground also requires the court to determine if rehabilitation is foreseeable for Ms. D. There is credible testimony that Ms. D has remained substance free since September 2001. Can Ms. D remain substance free in the future given the age and needs of the children? Dr. Kurt testified that as a "clinician one can feel more comfortable in an individual's ability to remain clean and sober after they have been in the community for approximately twelve (12) months" (testimony of Dr. Kurt at page 13). Dr. Rounsaville, Ms. D's own expert, initially stated that this twelve (12) month period should begin when abstinence began for Ms. D but later upon questioning from the court he testified that the twelve (12) month period should begin during the last three (3) months of CT Page 15328-o the C/A program. Using Dr. Kurt's analysis Ms. D's ability to remain substance free will be problematic until approximately March 14, 2003; using Dr. Rounsaville analysis, December 2002. This is not the first time that Ms. D has been involved with substance abuse programs which she has successfully completed. According to a D.C.F. social study dated January, 12, 1995 (a document of which the court took judicial notice) in 1993 Ms. D was in an impatient program for substance abuse at the Gaylord Treatment Facility. According to a D.C.F. Social Study dated May 27, 1997, (a document of which the court took judicial notice) Ms. D completed a program for chemical dependence at H.S.R. Her counselor at H.S.R. told the author of the D.C.F. study that Ms. D "was an ideal patient and had perfect attendance" (page 4 of this document). Ms. D also completed the Marilyn Baker Program at Niantic. In July 1999, Ms. D told Dr. Freedman ". . . that she decided a few years before this evaluation that the children were the most important thing to her so she stopped using drugs and was focusing on taking care of her children." (testimony of Dr. Freedman at page 23). Yet, despite all of these programs, Ms. D continued to abuse substances.
Much testimony has been offered to show that after the completion of the C/A program Ms. D has the social network in place to help her maintain her sobriety. She has moved out of the Truman Street neighborhood, where drugs were easily accessible — although she presently lives on Ellsworth Avenue in New Haven which is close by to area where drugs can be easily obtained. She is now married to her "significant other," Al R, who according to the witnesses associated with the C/A program, was involved with her therapy and has helped Ms. D remain substance free. Ms. D testified that Mr. R, with whom she was involved with for a significant period of time prior to their marriage and upon whom she was dependent financially, was formerly a drug dealer. Ms. D testified that she has moved into Mr. R's apartment on Ellsworth Avenue, the same apartment that Mr. R lived in while he was selling drugs. Ms. D testified that she "believed" that Mr. R never sold drugs out of his apartment. Ms. D also testified that while they were involved Mr. R never sold (or gave) drugs to Ms. D. Given Ms. D's lengthy and serious substance abuse problems and her relationship with Mr. R the court finds this testimony not to be credible. Ms. D further testified that Mr. R stopped selling drugs when she went to C/A and that she told Mr. R she would leave him if he started selling drugs again. Ms. D would have the court believe that Mr. R suddenly "retired" from an occupation from which he derived income for a long period of time because of Ms. D's request. Also, given the amount of legitimate income that Ms. D testified that both she and Mr. R receive, and the expenditures that Ms. D testified to, the court finds it not credible that Mr. R has stopped dealing. This important pillar of Ms. D's support network is built on CT Page 15328-p quicksand.
Ms. D has also been diagnosed with a number of disorders: Post Traumatic Stress Disorder (P.T.S.D.), Borderline Personality Disorder, and Bipolar Disorder. According to Dr. Rounsaville and Dr. Randall all of these disorders are lifelong disorders. These disorders portray an individual whose mood fluctuates up and down from very happy, excited, and good, to very sad and depressed; an individual who has not only emotional instability but unstable relationships; an individual who has difficulty making appropriate choices and exercises poor judgement. These disorders make treatment of substance abuse problems more difficult. Again the operative question is can the therapy and treatment that Ms. D has received at C/A and in follow-up programs result in rehabilitation within the foreseeable future.
Dr. Randall is of the opinion that given Ms. D's history of doing well in structured programs then relapsing, her risk factor for relapsing is "too high for the children to have to take on" (testimony of Dr. Randall at page 116). Ms. D's own witness, Dr. Rounsaville could not say within a reasonable degree of medical certainty that Ms. D would not relapse. Dr. Rounsaville did testify that Ms. D was in a good prognosis group and that this group has a better than even chance at succeeding at sobriety. A better than fifty-fifty (50-50) chance does not encourage the belief that within a reasonable time, considering the age and needs of the children, Ms. D could assume a responsible position in the lives of these children. While the court acknowledges the accomplishments made by Ms. D, given all of the above the court finds that substance abuse rehabilitation is not reasonably foreseeable in the future for Ms. D.
Therefore, the court finds by clear and convincing evidence that D.C.F. has proven the ground of failure to rehabilitate concerning Ms. D.
SHAWN S
As discussed previously Mr. S's main problem was that of finding adequate and appropriate housing for his children. One of the specific steps ordered on June 15, 1999 (a document of which the court took judicial notice) required that Mr. S secure and/or maintain adequate housing. Mr. S has testified that he has lived at, and still lives at, Howard Avenue in Ansonia. He testified that this dwelling is a one family house with three (3) bedrooms, a dining room, a living room and a kitchen. Mr. S testified that he found this housing on his own. He is living at this address with an individual he described as either his girlfriend or his fiance, whom he met in 1995, and her eighteen (18) CT Page 15328-q year-old son. Prior to living at Howard Avenue Mr. S did not have a permanent place to live. He stayed with friends, his brother, and his Godmother and Godfather. Mr. S testified he moved in together with his girlfriend and that this dwelling is" both (referring to Mr. S and his fiance) of our place . . ." (testimony of Shawn S at page 158). Yet Mr. S never testified as to his legal status regarding this dwelling. Do he and his girlfriend lease this house? Are they co-owners of it? Does his girlfriend own it and is he a tenant at will? How does Mr. S pay the rent or mortgage? His recent employment history is as questionable as is his current work status (detailed below). In addition, during the pendency of this case Mr. S listed his address on his application to Lebanon Pines as six forty-five (645) Grand Avenue, New Haven. Six forty-five (645) Grand Avenue is a homeless shelter. On his application to the Hill Health Center he listed his address as the Emmanuel Baptist Shelter in New Haven. Mr. S testified that both these statements were lies. Mr. S also testified that he went into a sober house during the summer of 2001 for a period of time while living in Ansonia. Although Mr. S testified that while living in Ansonia he did not have a problem with drugs or alcohol, he left the house in Ansonia because "I really did not have any place where I could stay clean and sober so I turned to the sober house (testimony of Shawn S at page 147). Given all of these factors, as of the adjudicatory date the court finds by clear and convincing evidence that Mr. S had failed to rehabilitate concerning his housing problem.
Can Mr. S achieve stable housing in the foreseeable future? Mr. S's relationship with his fiance has deteriorated to the point where their wedding has been postponed for a second time. They have according to Mr. S "a lot of things to iron out" (testimony of Shawn S at page 167). What Mr. S did not testify to, but Dr. Freedman did, was in July of 1999, Mr. S explained to Jamella that he had broken up with his girlfriend, Shirley about a year earlier. Mr. S has staked his housing situation on relationship that is troubled, on a dwelling from which he had to leave to remain clean and sober, and on a work situation that continues to be questionable. It is not reasonably foreseeable that Mr. S will achieve stable housing.
Therefore, the court finds by clear and convincing evidence that D.C.F. has proven that Mr. S has not rehabilitated in regards to his housing situation.
Another of the specific steps ordered on June 15, 1999, required that Mr. S in secure and/or maintain adequate income. According to the D.C.F. social study dated January 12, 1995, Mr. S was employed only for short periods of time and could not hold a job. Mr. S testified that when his children were removed from his sister's in March 2000, he was not CT Page 15328-r working. Then he started working through a temporary agency sometime in 2000. At the time of his trial Mr. S testified that he had been collecting unemployment for two (2) months because he had been laid off from a job at a boating company. This job was not through a temporary employment agency. Mr. S has recently started a carpentry business. He also testified he had received a license from the Department of Consumer Affairs to be a home improvement contractor. This license was not introduced into evidence. Mr. S's testimony presents an outlook for work at the present time that is nebulous at best. The court finds by clear and convincing evidence that D.C.F. has proven that Mr. S has not rehabilitated in regards to employment nor is rehabilitation reasonably foreseeable.
Therefore, the court finds by clear and convincing evidence that D.C.F. has proven the ground of failure to rehabilitate concerning Mr. S.
PETE C
On, May 28, 2002, this court dismissed this ground in regards to Mr. C.
 ABANDONMENT
D.C.F. has alleged that Jamella and Shawn were abandoned by Mr. S that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Jamella and Shawn. This same allegation was made in regards to Mr. C and Destiny. This ground tracks the language contained in Conn. General Statute Section 17a-112 (j)(3)(A). "Abandonment focuses on the parent's conduct . . . A lack of interest in the child is not the sole criterion in determining abandonment . . . C.G.S. Section 17a-112 (j)(3)(A) defines abandonment as the [failure] to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern, or responsibility for the welfare of the child . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare . . . Section 17a-112 (j)(3)(A) does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing reasonable degree of concern." In re John G. 56 Conn. App. 12,20-21, (1999). CT Page 15328-s
SHAWN S — JAMELLA AND SHAWN
An indicium of abandonment is the lack of acknowledgment of birthdays and other holidays by sending cards or gifts or in other ways acknowledging these special occasions. Michael Milano testified that hebelieved Mr. S sent gifts to Jamella and Shawn through his sister Jacqueline S while Jamella and Shawn were with her from June of 1999, to March, 2000. (testimony of Michael Milano of February 25, 2002, at page 142). However, Valecia Williams testified that Mr. S did not acknowledged Jamella or Shawn's birthdays of August 4, 2000, or August 4, 2001. Nor did he not sent any gifts or cards to Jamella or Shawn for Christmas, 2000, or Christmas, 2001
Another indicium of abandonment is financial support. Mr. S told Dr. Freedman in July 1999 that he had not paid child support in eight (8) years. Mr. S did not testify as to any current support he is voluntarily giving to the twins, only stating in 2000, when he was working his paycheck was garnished for child support in the amount of $100.00 per week.
Another indicium of abandonment is visits (or the lack thereof) between a parent and a child. Both visits between Mr. S and the twins and communication between Mr. S and D.C.F. concerning visits and are issues that have been raised. The testimony of Mr. S and the D.C.F. social workers are at odds. Mr. S is either (1) a frustrated father who constantly telephones numerous D.C.F. workers and stops by D.C.F. seeking visits with his children only to be ignored by D.C.F. resulting in no visits between Mr. S and the twins or, (2) a father who ignores his children, makes few, if any calls to D.C.F. to arrange visits and when D.C.F. does get in touch with him fails to follow through with visits. Mr. S would have the court believe that he is the subject of a D.C.F. conspiracy because not only did D.C.F. not communicate with him while this case was pending but D.C.F. ignored him when the twins were committed from September 1994, to December 1997:
 Question: Is it your testimony that from December of 1994 to September of 1997, you had no contact with them (D.C.F)?
 Answer: No, but I was trying to get in touch with D.C.F. to find out where the kids was placed at, you know, the same thing (D.C.F. non-cooperation).
 (testimony of Mr. S of May 14, 2002, at page 9)
CT Page 15328-t
Despite the minor conflicts between Ms. William's testimony and the D.C.F. narrative the court finds that the testimony of the D.C.F. workers to be credible and the testimony of Mr. S not credible, concerning the communications between them. Mr. S called D.C.F. sporadically and did not follow through when visits were set up. This lack of visitation is again consistent with the lack of contact that Mr. S had with the twins prior to the O.T.C. With the exception of a five (5) minute visit with Jamella on August 1, 2000, mentioned on page 17 of Petitioner's Exhibit D, Mr. S has not visited with his children since late 1999/early 2000. The reasons for this lack of visitation are either Mr. S's lack of desire to visit his children or his inability to follow through with planned visits. Ms. D succinctly stated Mr. S's attitude toward the twins when she told Dr. Randall "the father of the twins gets involved and asks for the kids and then just disappears" (Petitioner's Exhibit K at page 3).
Therefore, D.C.F. has proven by clear and convincing evidence Mr. S has abandoned Shawn and has abandoned Jamella.
PETE C
D.C.F. has alleged that Pete C has abandoned Destiny. There has been no testimony from any of the witnesses called by any of the parties that Pete C has had any contact with Destiny since she was born. Mr. C also failed to respond to the notice given him concerning this pending T.P.R., has never appeared in court, and he was defaulted on May 4, 2001. Therefore, D.C.F. has proven by clear and convincing evidence that Pete C has abandoned Destiny.
 DISPOSITION
In the dispositional phase of a termination case, the court must consider whether D.C.F. has proven by clear and convincing evidence that termination is in the best interest of the child(ren).
Before making a decision whether or not to terminate the Respondent mother's and/or respective Respondent father's parental rights the court must consider and make findings on each of the seven criteria set forth in Conn. General Statute Section 17a-112.
These criteria, and the court's findings, which have been established by clear and convincing evidence, are as follows:
(1) The court must look at the timeliness, nature and extent of services offered, provided, and made available to the parent and child by CT Page 15328-u an agency to facilitate the reunion of the child with the parents.
D.C.F. made considerable efforts to help Ms. D According to the D.C.F. social study dated January 12, 1995, D.C.F. first became involved with Ms. D on June 14, 1993, approximately nine (9) years before the close of evidence in this case. D.C.F. provided referrals to a multitude of agencies to address all Ms. D's issues. These services are listed in Petitioner's Exhibit D and Petitioner's Exhibit E. Ms. D not only failed to take advantage of these services, but at various times, Ms. D refused to sign releases so that D.C.F. could monitor her progress and make additional appropriate referrals.
D.C.F. made efforts to help Mr. S with one of his main problems that of housing. Mr. S followed through on the referral that D.C.F. made for him and eventually found housing on his own. Mr. S's lack of contact with D.C.F. made it difficult for D.C.F. to know what, if any further services, could or should be provided to him.
Mr. C has been a nonentity in Destiny's life and has not come forward to take advantage of any services to facilitate reunification with Destiny.
(2) This court finds that D.C.F. made reasonable efforts to reunite the parents with their respect children pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. For the reasons set forth previously, the court finds that D.C.F. offered appropriate services and sufficient time for the Respondent parents to reunify with their children.
(3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order must also be addressed. Preliminary specific steps were approved and ordered by the court (Cohn, J.) on July 2, 1999, for both Ms. D and Mr. S. On September 8, 1999, final specific steps were ordered by the court (Dewey, J.) for both Ms. D (Petitioner's Exhibit A) and Mr. S (Petitioner's Exhibit B). Ms. D, as of the adjudication date, failed to comply fully, or in part, with the following specific steps: (1) successfully complete substance abuse assessment and follow recommendations regarding treatment, (2) successfully complete substance abuse treatment including inpatient treatment if necessary and follow recommendations regarding aftercare treatment, including relapse prevention, (3) sign releases authorizing D.C.F. to communicate with service providers to monitor attendance, corporation, and progress toward identified treatment goals and for use in future proceedings before this court, (4) no substance abuse, and (5) CT Page 15328-v no involvement or further involvement in the criminal justice system.
Mr. S as of the adjudication date, failed to comply fully, or in part, with the following specific steps: (1) keep all appointments set by or with D.C.F., cooperate with D.C.F. home visits, announced or unannounced, and visits by the child's court-appointed attorney and/or guardian ad litem and, (2) keep children's whereabouts and your own whereabouts known to D.C.F., your attorney, and the attorney for the children.
Mr. C as stated previously, has not come forward to attend any court dates where specific steps could be entered.
(4) The feelings and emotional ties of the child with respect to the child's parents, any guardian of the child, and any person who has exercised physical care, custody, or control of the child for at least one year and with whom the child has developed significant ties must be addressed.
As discussed above Destiny does not view her mother as a psychological parent. Dr. Randall in her observation of Destiny and her mother in December, 2000/January, 2001, noted that Destiny appeared withdrawn, distant, and guarded. She observed that there was not a lot of closeness and little interaction between the two of them. When the interactional evaluation was over Destiny declined to give her mom a hug or a kiss. In her reevaluation of Destiny in December 2001, Dr. Randall opined that Destiny was even less connected with her mother than in the past. In contrast, Dr. Randall observed that Destiny and her foster mother, Bernice Brown, were attached and that they had an open, positive, and trusting relationship in which Destiny felt more comfortable. Valecia Williams described the relationship between Destiny and Ms. Brown as loving and nurturing. Karen Meeks echoed Dr. Randall noting that Destiny and Ms. Brown have a trusting, positive, and comfortable relationship.
Destiny has no feelings toward or emotional ties with Mr. C because he has never been a part of her life and she has had no contact with him.
The court has previously found that Jamella views her mother as a psychological parent. Dr. Randall observed in the interactional between Jamella and Ms. D that although Jamella was excited and happy to see her mother, there was some ambivalence in Jamella's relationship with her mother. Dr. Randall also noted that when she saw Jamella for the second time she seemed less emotionally connected to Ms. D than when she first saw Jamella. Kristen Holdt echoed this analysis noting that although Jamella spoke highly of her mother, she was afraid of her other and was CT Page 15328-w mad at her because she had not taken care of her. However, Ms. Holdt disagreed in part with Dr. Randall, concluding that Jamella had conflicting feelings toward her mom and that she had a negative relationship with her mother.
The court has previously found that Shawn views his mother as a psychological parent. Dr. Randall observed in the interactional between Shawn and Ms. D that although Shawn, like Jamella, was excited and happy to see his mother, there was not a lot of affection between them. Dr. Randall also noted that when she saw Shawn for the second time he also seemed less emotionally connected to Ms. D than when she first saw Shawn. Kristen Holdt concluded that although Shawn had positive feelings toward his mother, Shawn, like Jamella had conflicting feelings toward his mother.
Dr. Freedman conducted an interactional study in July 1999, of Mr. S and the twins. Dr. Freedman noted that the children interacted well with their father and were well-behaved and calm with Mr. S, at least in comparison with their behavior with their mother. Mr. S was able to handle the twins and supervised them appropriately. Dr. Freedman's description of this interactional describes Mr. S as, perhaps, an appropriate care-giver. There is no description of the "feelings and emotional ties of the child(ren) with respect to the child's parent." Jamella's feelings toward her father are negative. She speaks little of him and when she does she expresses negative emotions. There was no testimony as to any feelings or emotions Shawn has in relation to his father because Shawn, like Jamella, also rarely speaks of his father.
In contrast to the relationship between Jamella and her biological parents, Mary Diamond testified that the relationship between Jamella and Ms. Steele is a positive, respectful, and loving one. Although Ms. Diamond was not qualified as an expert the court finds that given the length of time she treated Jamella and the relationship between them, her testimony is to be given considerable weight. Valecia Williams saw a great deal of affection between Jamella and Ms. Steele and stated succinctly that Jamella loves Ms. Steele and that Ms. Steele loves Jamella.
In contrast to the relationship between Shawn his biological parents, Kristin Holdt testified that Shawn is comfortable and happy with the Harris and that they truly care about him. In addition, Ms. Holdt describes in her evaluation summary marked as Petitioner's Exhibit N, that the Harris family has provided Shawn with love and security. Valecia Williams described the relationship between Shawn and the Harris as a respectful one. CT Page 15328-x
(5) The age of the children. As of the last day of testimony, Destiny was twelve (12) years old; Jamella and Shawn almost eleven (11).
(6) The efforts the parent has made to adjust her or his circumstances, conduct, or conditions to make it in the best interest of the child to return to such home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Ms. D has made great strides to overcome her substance abuse problem, however, as of the adjudicatory date, Ms. D has failed to rehabilitate and has failed to take advantage of the services offered to her so that she can parent her children. With the exception of one missed visit and within the limits of the conditions of her probation, Ms. D has maintained contact with her children. She has sent gifts to her children on appropriate occasions. Ms. D has had no contact with the foster parents of any of her children.
Mr. S has found what appears to be appropriate housing. However, the stability of this situation is questionable at best. In addition, Mr. S's work situation appears unstable. Mr. S did not pay any child support for the twins for eight (8) years. Mr. S did not testify as to any current support he is voluntarily giving to the twins, only stating in 2000, when he was working his paycheck was garnished for child support in the amount of $100.00 per week. With the one possible exception that Mr. Milano testified about, Mr. S has not provided any gifts or cards to the twins on any occasions. Except for a few visits when the twins were with Mr. S's sister, Mr. S has not visited the twins. Other than when Mr. S communicated with his sister when the twins were with her and running into Shawn and Shawn's foster father at Lowe's, Mr. S has had no contact with either Jamella's or Shawn's foster parents.
Mr. C has never been a part of Destiny's life and he has had no contact with her. He has not contributed financially to her upbringing, has not visited her, or had any communication with her. Mr. C has had no contact with Destiny's foster mother.
(7) The final consideration is the extent to which a parent has been prevented from maintaining a meaningful relationship with his or her child by the unreasonable act or conduct of the other parent of the child, or CT Page 15328-y the unreasonable act of any person or by the economic circumstances of the parent. This court is unaware of any unreasonable act or conduct by anyone or any agency or of any economic circumstance that prevented any of the Respondents from having a meaningful relationship with their child(ren).
 BEST INTEREST OF THE CHILDREN
The court has determined that the ground(s) for termination of parental rights of the Respondent mother and the Respondent fathers have been proven by clear and convincing evidence. The court has also determined that the seven (7) statutory criteria, which all weigh in favor of termination being in the best interest of Destiny, Jamella, and Shawn, have been established by clear and convincing evidence.
The D.C.F. case involving these children was opened five (5) times generating twenty-six (26) referrals of which seventeen (17) were confirmed. One of the main reasons that the children suffered neglect at the hands of Ms. D was Ms. D's longstanding substance abuse problem. Both Jamella and Shawn were exposed to intravenous drugs and alcohol in utero. Since its first involvement with Ms. D D.C.F. has investigated the following allegations of neglect concerning Ms. D: the twins being behind schedule in their immunizations, deplorable home conditions, lack of proper adult supervision, and physical abuse. These allegations resulted in commitment and recommitment of all three (3) children. The affidavit in support of the June 15, 1999, O.T.C. (a document of which the court took judicial notice) states that on June 13, 1999, Ms. D grabbed Destiny by the hair and punched her three (3) times. She was taken to the hospital where the doctor observed that she had a hematoma on her forehead and was discharged. Ms. D admitted in her testimony that she hit Destiny on June 13, 1999, and hit Destiny on other occasions on the leg. She denied all other allegations of abuse. While Destiny was living with her mother she did not have food to eat or prepared for her. Destiny would get food from an aunt who lived upstairs from her. This is important not only for the fact that it occurred but also is significant because it is a memory of times when things were insecure and not safe for Destiny. Just as in Destiny's case, the twins suffered at the hands of their mother. Jamella related how both Shawn and Destiny were also hit by Ms. D. Jamella also showed Michael Milano a mark on her leg that she said was caused when Ms. D hit her with an electric cord. Jamella told Ms. Williams about being hit by her mother with various other items — shoes, extension cords etc. Jamella also told Ms. Williams about an incident when Ms. D, who was in the middle of a domestic dispute, threw a butter knife at her. Jamella's credibility about these incidents has been questioned. Mr. Milano found Jamella to be credible. Mary CT Page 15328-z Diamond testified that when she started treating Jamella, she had problems telling the truth. However, Ms. Diamond testified that while Jamella may "glorify" a situation she now tells the truth. Jamella also told Ms. Holdt about an incident involving Ms. D and a knife. Ms. Holdt could not verify this incident but felt that Jamella was expressing a real fear of Ms. D and a sense of being threatened by her. Shawn told Mr. Milano about being beaten, being left alone, being yelled at and missing school when he lived with Ms. D. He also told him about being thrown down the stairs by Ms. D a few weeks prior to his removal (although the D.C.F. investigator concluded that the fall was an accident).
While Ms. D was in the substance abuse program at the Gaylord Treatment Facility in 1993, an allegation of neglect was made against Mr. S alleging that the twins were without food and the home was chaotic. Mr. S signed a voluntary placement agreement in response to these allegations and the twins were placed in foster care for four (4) days and then returned to Ms. D Mr. S testified that he never saw Ms. D use drugs when he lived with her and the twins, had no knowledge that Ms. D used drugs after he moved out, had no concerns as to how the twins were treated by Ms. D while he was living with them, and was never told by the children that they were being hit by Ms. D. According to the D.C.F. social study dated January 12, 1995, Mr. S became involved with drugs after he and Ms. D started living together. In contrast to his testimony, Mr. S told Dr. Freedman that he was aware of Ms. D's alcohol/drug abuse and other neglect issues while he was living with Ms. D. Yet, he did nothing about these issues except to try and convince Ms. D to stop smoking crack. Ms. D's response to him was to take the twins and leave. Mr. S did leave, but he did not take the twins out of this home. After he left the twins continued to tell him of Ms. D's substance abuse. This was consistent with what he had observed because Jamella showed him marks left on her that she said came from Ms. D hitting her. He still did not take the twins out of this environment.
Destiny has adjustment disorder — a disorder that occurs when an individual has undergone stress or change in their life. When Destiny was first seen by Karen Meeks, she was "very tense, very anxious, and extremely guarded. When I first saw Destiny in the waiting room, she was like a little statue sitting there" (testimony of Karen Meeks at page 31). The trust relationship between Destiny and her mother had been broken because of the abuse suffered by Destiny at the hands of Ms. D. Because the trust relationship between Destiny and Ms. D had been broken, Destiny repressed all her emotions and experience and had difficulty forming a trust relationship with any adult, although after her treatment with Ms. Meeks she was able to trust adults and form CT Page 15328-aa relationships with them. Dr. Randall noted in her observation of Destiny with her mother that Destiny did not show much affection toward her mother and did not interact closely with her. Destiny, contrary to most abused children, never idealized her life with Ms. D or wished for a life with Ms. D. Destiny does not view her mother as a psychological parent.
Destiny had no problem separating from her mother when a visit was over. Destiny's foster mom told Michael Milano that after Ms. D was incarcerated, Destiny was happier than when she was first placed with her, that Destiny appeared relieved that her mom had been incarcerated, and was more open with her foster mom. Ms. Williams echoed this observation noting that when Ms. D was incarcerated Destiny was more open and at ease with her. After Ms. D was released from incarceration Destiny appeared agitated and Ms. Brown and Ms. Williams noted that Destiny was acting differently — distant and quiet. Destiny views Ms. Brown as her psychological parent. Ms. Brown has provided a compassionate, nurturing, and stable home for Destiny which has created a sense of security for Destiny making her less anxious. There is a good attachment between Ms. Brown and Destiny. Destiny gets along well with her foster family. She is comfortable in this home and is welcomed by family members and has grown close Ms. Brown's daughters. To paraphrase Valecia Williams, Ms. Brown's home is Destiny's home. Ms. Brown is willing to adopt Destiny. Destiny has had no relationship with her father who has been missing for her entire life. Removal from the Brown home to try and reestablish a bond with her mother, according to Ms. Meeks, would be detrimental to Destiny. Destiny told Ms. Williams that she wants to be adopted by Ms. Brown but has also told her in February 2001 that she did not want to be adopted "right now." Destiny was ambivalent about being adopted when she was seen by Dr. Randall. Dr. Randall was not surprised by this ambivalence, ascribing it, in part, to that general human condition of a little waffling at the moment a decision has to be made and, in part, to Destiny's desire not to be disloyal to her mother. The fact that Destiny has even stated that she wants to be adopted is, according to Dr. Randall, unusual and significant. After being explained what adoption means, Destiny has never expressed mixed feelings to Ms. Williams about being adopted. Karen Meeks, stated in her letter dated August 14, 2001, (Petitioner's Exhibit H) that "it is clear to me . . . that Destiny does not choose to live with her biological mother". This does not mean that Destiny does not love her mother. According to Karen Meeks, Destiny loves her mother, but realizes that her mother cannot take care of her. Destiny told Karen Meeks, and whom Ms. Meeks describes as a bright, young woman, that she wanted to be adopted by Ms. Brown. Ms. Meeks, whom Destiny had grown to trust, was emphatic in her testimony that when Destiny told her she wanted to be adopted she said this because it is her true desire, not something said to please Ms. Meeks. Destiny CT Page 15328-ab told Dr. Randall that it is difficult not knowing what is happening in her future. Destiny has told Ms. Williams and Ms. Meeks that she wants to change her name to Jasmine Mahogany Brown. Dr. Randall noted that this shows that Destiny wants to be a part of her foster family. Adoption is important to Destiny according to Ms. Meeks because, as Ms. Meeks stated in Petitioner's Exhibit H at page two (2) "Destiny needs to have the security of knowing full acceptance in a family, which adoption would provide." Dr. Randall echoed this stating that adoption would allow Destiny to really feel that there is a "safe family setting for her that there isn't the risk that this could all be changed some day in court, and so it really provides her with that stability." (testimony of Dr. Randall at page 44)
Jamella has never mentioned wanting to live with her father. Jamella told Mr. Milano at times that she wanted to be with her birth family and at times also told him that she wanted to be with her foster family. By her birth family Jamella means her mother and her siblings. Ms. Williams feels that Jamella confides in her. Jamella stated to Ms. Williams that she did not want to go back to her mother because she was fearful of being hit by her mother. This is because Jamella is really conflicted about her relationship with her mother. After Ms. D was released from incarceration, Jamella's behavior according to Ms. Steele "skyrocketed" — she would not listen to Ms. Steele, ran around the house screaming, got suspended from school for walking out of a classroom, etc. Jamella sees Ms. Steele as a psychological parent. She views her biological mother, to some extent as a psychological parent, but not on a day to day basis and seeks primary nurturance and security from Ms. Steele. The only time Jamella tells Ms. Steele that she wants to go back and live with her biological mother is when she is angry with Ms. Steele. Dr. Randall testified that Jamella talked about wanting to go home. Jamella also told Ms. Holdt that she wanted to go back and live with her mother, but that she was mad at her mother because she had not taken care of Jamella. Ms. Diamond testified Jamella fluctuated about wanting to go and live with her mother. However, Jamella told Ms., Diamond she would only live with her mother if her mother stopped hitting her. According to Ms. Diamond, Jamella's reason for wanting to live with Ms. D is because it would be fun — she would not have to go to bed until late and be able to stay out and generally live in an unstructured, unsupervised setting where she could do what she wants. Whenever Ms. Diamond presented Jamella with a choice of where she would like to live, what would be her ideal place, her first response was always that she wanted to be with Ms. Steele — a home that is be quiet, peaceful and calm. Ms. Diamond advocates for adoption for Jamella. CT Page 15328-ac
Shawn has never mentioned wanting to live with his father. Shawn told Mr. Milano that he loved his mother. Shawn also stated, however, that he was fearful of his mother. Ms. Williams testified that Shawn was ambivalent about talking about going home to his mother. This is because Shawn, like Jamella, is really conflicted about his relationship with his mother. Like Jamella, Shawn's behavior got worse after his mother was released from incarceration — he was suspended from school for fighting with his sister. In addition, he started to withdraw in the classroom. Shawn told Dr. Randall that he wanted to go back and live with his mother. However, Dr. Randall felt that Shawn did not have an understanding of what that meant because Shawn told Dr. Randall that living with his mother was better — it was more fun, he had more friends at his old home, did not have to walk so far to school and he could play with his cousins. Dr. Randall also stated that Shawn at one time was uncertain if the Harris would adopt him. Dr. Randall felt that this caused Shawn to look at living with his mother as a "fantasy." Shawn views his biological mother as a psychological parent, but, like Jamella, he also views Mr. and Mrs. Harris as psychological parents and seeks primary nurturance and security from Mr. and Mrs. Harris.
The twins have special needs. These needs have led to various problems for the twins. Jamella has low cognitive functioning scores within the range of mild mental retardation on her intellectual functioning. Jamella's reality testing may be compromised, she does not deal with stressors well and is prone to act impulsively, perhaps aggressively. She is also emotionally needy and seeks attention, possibly because she never got attention as a child. Her diagnoses are Attention Disorder Hyperactivity Disorder (A.D.H.D.), Oppositional Defiant Disorder (O.D.D.), P.T.S.D. and Reactive Attachment Disorder. Shawn's intellectual testing puts him into the average to low average range. Shawn has many emotional and behavioral problems. He has problems with anger control, impulsivity, and has a difficult time focusing on and finishing tasks. Since February 2002, Shawn is taking Tenex, a prescribed medication to manage and/or decrease impulsivity. He, like Jamella, has been diagnosed with O.D.D. He also has been diagnosed with Adjustment Disorder. These problems have manifested in a number of ways. Both the twins have had discipline problems in every school they have been enrolled in that have resulted in suspensions for both children. One of the incidents that was especially alarming involved Shawn throwing scissors at Jamella in a classroom, endangering all the students in its path. In addition, their aunt could not manage their behavior. They were both out of control — misbehaving, not listening and fighting with each other and with their cousin who lived with their aunt, and having significant problems in school. The twins were so hard to control that their aunt, despite loving them, was overwhelmed by their behavior and became frustrated to CT Page 15328-ad the point where she asked D.C.F. numerous times that they be removed from her home.
The twins need external control and a sense of structure around them. After being removed from their aunt's home, the twins have, albeit slowly, improved in their respective foster homes. The respective foster parents have done a good job raising Jamella and Shawn.
Ms. Steele loves Jamella, is supportive of her and is excellent advocate for Jamella, getting services for Jamella and coming up with different ideas to help her. Ms. Steele has set limits for Jamella and Jamella responds to them. Jamella respects and adores Ms. Steele and has told Ms. Williams that she wants to be adopted by her. She not only calls Ms. D mom, but she calls Ms. Steele mom as well. Jamella was hard to control and there came a time when Ms. Steele became frustrated with Jamella and asked that she be removed from her home. However, their relationship slowly improved and when D.C.F. located another home for Jamella, Ms. Steele changed her mind and not only asked that Jamella stay with her, but offered herself as an adoptive resource for Jamella. This change of attitude on the part of Ms. Steele did not present any cause for concern to Ms. Diamond because Ms. Steele has considered adoption for a long time, has seen Jamella at her worse and came to the realization that she loves Jamella and wants her to stay in her home. According to Ms. Diamond Jamella has improved substantially from when Ms. Diamond first started treating her. Jamella feels more secure but she needs" a sense of permanency in order to process her traumatic upbringing" (testimony of Mary Diamond at page 71).
Shawn's foster family, like Jamella's foster mom, is also supportive of Shawn and they are devoted to him and advocate for him. They have called Ms. Holdt to see if the way they are handling Shawn's problems is appropriate. Ms. Holdt testified that the Harris' response to Shawn's problems is always appropriate. The Harris are nurturing, supportive people who are attentive to Shawn's best interest, understand his struggles and truly care about him. They have handled his challenging behavior well and have provided Shawn with the structured home that he needs. An example of this is that the Harris walk Shawn not only to school, but to his class because while waiting for class to begin Shawn was getting into trouble. Ms. Holdt testified that the Harris have done "a wonderful job" with Shawn. Shawn relates well to his foster parents and fits well into their family. He is comfortable and happy with the Harris, is vested in his life there and feels as though he is part of the family. He has responded well to this environment and likes to know that there is a home where he is loved and accepted. He responds to the Harris as parents. Kristen Holdt noted that Shawn more often calls his foster CT Page 15328-ae mother and foster father "mom" and "dad" as opposed to Aunt Bess and Uncle Harry. The Harris have always been committed to providing a home for Shawn. The Harris have recently agreed to adopt Shawn because they realize that he needs the security and stability that adoption will give him. Shawn told Valecia Williams that he was worried about where he was going to be, what he is going to be doing, and needs a decision about where he can call home. Shawn has also told Ms. Williams that he wanted to be adopted by the Harris. Shawn, like Jamella, needs the security, stability, and permanency that adoption by the Harris family would provide. Kristen Holdt testified that Shawn is a child at risk due to the neglect he has suffered from in the past with Ms. D. She opined that long term foster care would be detrimental to Shawn and advocates strongly for the adoption of Shawn by the Harris family. She feels that adoption by the Harris would be an excellent plan for Shawn because he "has thrived under their care and they . . . are impressive people and are able to manage his behavior . . . and accept him wholeheartedly (testimony of Kristen Holdt of April 29, 2002, at page 150). Dr. Randall agreed with this recommendation stating that Shawn needs the security that adoption would provide and noted the emotional instability for Shawn that resulted when he did not go home with his mother as he thought he would for Christmas, 2000.
Ms. D has not been able to place her children's needs ahead of her own. Dr. Randall noted that Ms. D is a woman who does well in structured settings. Ms. D, Dr. Randall observed in her report dated January 18, 2001, is a woman who ". . . continues to struggle with emotional volatility and poor judgement . . . she continues to feel resentful of social expectations and norms and can be expected to have further problems with authority figures in her life . . . (she) seeks excitement in her life . . . (she) is easily bored and this also increases her likelihood for further drug and alcohol use. She has trouble delaying gratification and tends to act without thinking through the consequences . . . interpersonal relationships could be problematic for Ms. D" (Petitioner's Exhibit K at page 12). Ms. D testified her children do not continue to suffer because of Ms. D's actions generated by her substance abuse. They continue to suffer, according to Ms. D, because they are not with her. According to Dr. Randall Ms. D has "blamed those problems (emotional/behavioral problems) entirely on the fact that they (the children) were separated from her with the idea that if they could just come back to her those things would go away and the kids would be fine" (testimony of Dr. Randall at page 38.). Dr. Randall further stated that all three (3) children needed permanency: ". . . the children needed to have permanent homes . . . each of the kids were showing some emotional difficulties and those difficulties seemed to be related at least in part to a sense of insecurity in their lives . . . it would be unfair to the CT Page 15328-af children to just maintain them in a sense of kind of emotional and legal limbo waiting to see really which way they are going to go." (testimony of Dr. Randall at page 28 and page 32).As of the last day of trial Destiny was almost twelve (12) years old. She has been in the custody of D.C.F. for approximately five (5) years and three (3) months or approximately (44%) of her life. As of the last day of trial the twins were almost eleven (11) years old. They have been in the custody of D.C.F. for approximately six (6) years approximately or approximately (54%) of their lives. All three children have emotional/behavioral problems which Ms. D does not understand. Nor does Ms. D know what she needs to do to address these needs. To paraphrase Dr. Randall, given all that these children have gone through and their need for stability and permanency which their respective foster families will give them, allowing more time to build a stronger relationship with Ms. D is counterproductive.
Dr. Freedman noted that Mr. S had exercised poor choices and shown poor judgement in relation to his children "other than him (Mr. S) saying that he had spoken about the problems in the home at a court hearing, he . . . (never) made any effort to try to protect them or try and get them out of a home that he described as abusive and neglectful." (testimony of Dr. Freedman at page 29). Given what the twins have gone through and their need for stability and permanency which their respective foster families will give them, allowing more time to build a stronger relationship with Mr. S is not only counterproductive but unforeseeable because as Michael Milano succinctly stated Mr. S ". . . was never in a full position to take the children. There was always one more step . . . one more thing had he had to do, which was, you know, get the place, get a job where you have enough money. But he was never able to do everything." (testimony of Michael Milano of February 28, 2002, at page 78).
Based on the foregoing findings, the court determines, by clear and convincing evidence, that it is in the best interest of Destiny D that a termination of parental rights is entered with respect to both the Respondent mother Patricia D and the Respondent father Pete C. Also the court determines, by clear and convincing evidence, that it is in the best interest of both Jamella S and Shawn S that a termination of parental rights is entered with respect to both the Respondent mother Patricia D and the Respondent father Shawn S. Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of D.C.F. is appointed statutory parent for Destiny, Jamella, and Shawn. The Commissioner shall file with this court no later that thirty days following the judgement a written report of efforts to affect a permanent placement for Destiny, Jamella, and Shawn and file CT Page 15328-ag further reports as are required by state and federal law.
 ___________________ Gerard F. Esposito Judge of the Superior Court
To: All Counsel
From: Judge Esposito
Re: D / S — Typographical/Grammatical Errors
Date: November 14, 2002
I have corrected certain minor typographical and/or grammatical errors. None of these corrections affect the substance of the decision. The filing date of the decision remains November 12, 2002.